IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

NIESHA ANTHONY, as parent and
next friend of ZARIAH ANTHONY,
a minor,

        Plaintiff,

v.

        Case No. 23-CV-00967-SPM

O'FALLON TOWNSHIP HIGH
SCHOOL DISTRICT 203 BOARD OF
EDUCATION, et al.,

        Defendants.

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

This matter comes before the Court for consideration of a Motion for Summary

Judgment filed by Defendants O'Fallon Township High School ("OTHS") District 203

Board of Education, Vice Principal Twana Dollison, Principal Richard Bickel, and

Superintendent Dr. Darcy Benway (Doc. 123). Having been fully informed of the

issues presented, the Defendants' Motion for Summary Judgment is **GRANTED**.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case arises from incidents of alleged discrimination and retaliation

against Zariah Anthony by the Defendants while Zariah was enrolled at OTHS

during the 2021–22 (ninth grade) and 2022–23 (tenth grade) school years. (*See* Doc.

154). In the operative Third Amended Complaint, Niesha Anthony[1] alleges that Vice

---

[1] The original Complaint and First Amended Complaint contained claims brought by Niesha on
behalf of Zariah as well as claims brought on behalf of Niesha directly. (*See* Docs. 1, 26 This Court

Principal Dollison, in a meeting with Zariah and other students "to discuss the bullying of ZARIAH's friend by other students," said "*[a]ll the dark-skinned people are causing all of the problems lately*." (*Id.*, ¶¶ 22, 24). This "caused a substantial detrimental effect on ZARIAH's mental health and, having been made by a school official in a position of trust and authority, substantially interfered with ZARIAH's ability to participate in or benefit from the services, activities and/or privileges provided by OTHS." (*Id.*, ¶¶ 24, 29).

Once Zariah informed her mother of this incident, Niesha contacted Principal Rich Bickel the same day. (*Id.*, ¶ 31). Niesha alleges that, instead of conducting an investigation, Bickel contacted Dollison and told her about the phone call from Niesha. (*Id.*, ¶ 37). Niesha alleges that Dollison then called her directly and that Niesha terminated the phone call because she was "[s]tunned that Principal Bickel had so flagrantly violated OTHS Board of Education Policy by informing Vice-Principal Dollison of her racial complaint of harassment rather than conducting an investigation." (*Id.*, ¶ 39). Niesha then called Superintendent Dr. Darcy Benway that same day. (*Id.*). Dr. Benway allegedly "informed Niesha Anthony that Vice-Principal Dollison could not have made a racist, harassing statement to ZARIAH or the other OTHS students in attendance at the May 12, 2022, meeting." (*Id.*, ¶ 43). When the parents of other students in the May 12 meeting contacted Dr. Benway, she informed them of the same and allegedly refused to conduct an investigation. (*Id.*, ¶¶ 48–50). Niesha claims that Dollison "retaliated against ZARIAH by recording on ZARIAH's

---

dismissed the claims brought on Niesha's behalf due to lack of standing on January 23, 2024. (*See* Doc. 38). All of the remaining claims are brought by Niesha on Zariah's behalf. (*See* Doc. 154).

'Student Discipline Report' that Niesha Anthony had called to complain to Principal Bickel and Superintendent Benway '***about me being a racist***.'" (*Id.*, ¶ 53). Niesha claims that "[t]he Defendants sought to conceal this act of retaliation by failing to inform ZARIAH and/or Niesha Anthony that Vice-Principal Dollison recorded their report of a racist statement made by Vice-Principal Dollison on ZARIAH's disciplinary record, and by failing to afford them notice or an opportunity to rebut, appeal or grieve the patently retaliatory report." (*Id.*, ¶ 60).

On August 19, 2022 (after the 2022 summer break[2]), Zariah reported being bullied and harassed by what she calls the "Gang of Bullies" on the same day. (*Id.*, ¶¶ 66–67). Niesha states that she called OTHS to request a meeting and that her requests were ignored. (*Id.*, ¶¶ 72, 74). Niesha states that on September 6, 2022, Zariah physically defended herself in an altercation with the Gang of Bullies. (*Id.*, ¶¶ 78–90). Zariah was initially suspended out-of-school for ten days. (*Id.*, ¶ 94). Following a disciplinary hearing before the OTHS Board of Education September 12, 2022, Zariah was expelled from OTHS for the remainder of 2022–23 school year. (*Id.*, ¶ 108). Niesha claims that the note in Zariah's Student Discipline Report stating that Niesha accused Dollison of being a racist was explicitly used in support of the expulsion. (*Id.*, ¶¶ 109–10). Niesha alleges that this was in violation of Illinois law and was a disproportionate response. (*Id.*, ¶¶ 114–28).

---

[2] In O'Fallon, high school is bifurcated into a campus for ninth-grade freshman (Milburn) and a campus for upperclassmen (Smiley). *See About OTHS*, O'FALLON TWP. HIGH SCH., https://www.oths.us/district-info/about-oths [https://perma.cc/9SQV-JF24] (last visited Dec. 15, 2025).

Niesha Anthony initially filed a Complaint in state court in St. Clair County, Illinois on February 23, 2023. (*See* Doc. 1, Ex. A). The Defendants removed the case to this Court on March 24, 2023 (Doc. 1) and filed a Motion to Dismiss (Doc. 18) on May 3, 2023. This Court granted Niesha leave to file an amended complaint (Doc. 24), which was filed on July 31, 2023. (Doc. 26). Another Motion to Dismiss (Doc. 32) was filed on September 19, 2023, with Niesha responding on October 3, 2023. (Doc. 34). The Court held oral argument on November 29, 2023. (*See* Doc. 37). The Court granted the Defendants' Motion to Dismiss in part and denied it in part on January 23, 2024. (*See* Doc. 38). The Court entered a Scheduling Order on February 20, 2024. (Doc. 46). Niesha filed a Second Amended Complaint on February 21, 2024. (Doc. 47). While this Court granted Plaintiff permission to file a Third Amended Complaint (*see* Doc. 118), Plaintiff did not do so until prompted at oral argument on December 9, 2025. (*See* Docs. 153, 154, 156).

The Defendants filed the instant Motion on July 18, 2025. In addition to a 51-page brief[3] (Doc. 126), they filed a 36-page Statement of Material Facts (Doc. 123) and 1,237 pages of exhibits (Doc. 127). Plaintiff Anthony responded in opposition on October 23, 2025 with a 30-page "summary of material facts," 60 pages of argument, some 247 pages responding to Defendants' Statement of Material Facts, and another 539 pages of exhibits. (Docs. 140–42). The Defendants filed a Reply on November 17, 2025 along with a 296-page response in opposition to the "Response to Defendants' Statement of Material Facts." (Docs. 150, 152).

---

[3] The Defendants also filed an amended version of page 25 of their brief due to formatting issues with the original page 25. (*See* Doc. 123, p. 25; Doc. 128).

## APPLICABLE LAW AND LEGAL STANDARDS

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) *(*citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (quoting *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008)). The nonmovant cannot simply rely on its pleadings; the nonmovant must present admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596

(7th Cir. 1995); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir. 1993), *cert. denied,* 510 U.S. 1111 (1994); *Celotex,* 477 U.S. at 323–24).

ANALYSIS

Before discussing the legal arguments made by the parties, this Court must take note of the voluminous briefing for the instant Motion. As noted *supra,* Plaintiff submitted a 247-page "Response to Defendants' Rule 56.1 Statement of Material Facts in Support of Its Motion for Summary Judgment and Plaintiffs' Statement of Additional Material Facts" (Doc. 141) along with 539 pages of exhibits (Doc. 142). In their Reply (Doc. 150), Defendants argues that "Plaintiffs response is solely designed to overwhelm and frustrate this Court to achieve their goal of having the Court throw up its hands and find that given the sheer volume of materials submitted by plaintiffs, questions of fact must exist." (*Id.*, p. 2). They insist that Plaintiff's Response violates Local Rule 56.1 because "[t]he overwhelming majority of additional "facts" are immaterial and not central to the legal arguments" and "[t]he statements contain hearsay and are redundant by restating each witness's version of the same events, rather than presenting a single fact and citing to each witnesses' testimony." (*Id.* (citing *Sholes v. Bd. of Regents of Univ. Sys. of Georgia,* No. CV 119-022, 2023 WL 2575570, at *1 (S.D. Ga. Mar. 20, 2023), a*ff'd sub nom. Sholes v. Anesthesia Dep't,* No. 23-11291, 2024 WL 700438 (11th Cir. Feb. 21, 2024))). The district court in *Sholes* noted that parties "may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." 2023 WL 2575570, at *14 (quoting *Preis v. Lexington Ins. Co.*, 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007)). The court continued,

writing that "[e]ssentially, the Court has no duty 'to distill every potential argument that could be made based upon the materials before it on summary judgment.'" *Id.* (citing *Preis*, 508 F. Supp. 2d at 1068). While "an unweidly record and a mass of factual assertions" often means that "there must be a genuine issue of material fact somewhere," that is not a guarantee. *Goswami v. DePaul Univ.*, No. 12 C 7167, 2015 WL 251304, at \*1 (N.D. Ill. Jan. 20, 2015) (citing *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818 (7th Cir. 2011)); *see also id.* (citing *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 417 (7th Cir. 2000)).

The Seventh Circuit has held stated that "because summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); 10 WRIGHT, MILLER & KANE § 2712, at 574–78). "The parties, in turn, bear a concomitant burden to identify the evidence that will facilitate this assessment." *Id.* Moreover, with respect to local court rules requiring the parties to file statements of material facts, the Seventh Circuit "has repeatedly recognized the importance and usefulness of this and similar local rules throughout the circuit, as well as 'the exacting obligation these rules impose on a party contesting summary judgment.'" *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (quoting *Waldridge*, 24 F.3d at 921–22). The Seventh Circuit wrote that "[t]hese rules serve to notify the parties of the factual support for their

opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way—thus facilitating its judgment of the necessity for trial." *Id.* Critically, "just as a district court is not required to 'scour the record looking for factual disputes,' it is not required to scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case." *Id.* (quoting *Waldridge* at 922); *see also F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) (quoting the same).

Here, Plaintiff's *Response* to Defendants' 142-paragraph, 30-page Statement of Material facts is some 98 pages long and their own Statement of Additional Material Facts is composed of 981 numbered paragraphs spread over 150 pages. (*See* Doc. 141). Defendants' Response to this Statement of Additional Material Facts is another 296 pages. (Doc. 152). The amount of briefing in this case is comparable to that in the Second Amendment constitutional challenge adjudicated by this Court just over one year ago. *See Barnett v. Raoul*, 756 F. Supp. 3d 564 (S.D. Ill. 2024), *judgment entered*, No. 23-CV-00141-SPM, 2024 WL 5707234 (S.D. Ill. Dec. 9, 2024). While the parties were permitted to exceed the Local Rule 56.1(e) page limits for argument, Plaintiff's submission of a Statement of Additional Material Facts so detailed that it itself required a thirty-page summary shows the herculean effort that Plaintiff's counsel has made to prove that this case must be submitted to a jury. With that in mind, this Court has made every effort to review all submitted materials to the maximum extent possible. This Court commends both parties on their vigorous arguments made in support of their respective clients—their efforts are a testament to their dedication.

Moving forward, the Court will address Plaintiff Anthony's claims in the sequence utilized by the Defendants in their Motion and supporting Brief (*See* Docs. 123, 126). This Court will endeavor to condense and crystallize the parties' arguments to the greatest extent possible.

## I.   Race-Based Discrimination (Title VI & ICRA, Counts 1 & 3)

Title VI of the Civil Rights Act of 1964 states that "no person shall, 'on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity'" that is within the penumbra of Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 278 (2001) (quoting the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U.S.C. § 2000d). The statute specifically prohibits intentional discrimination. *See id.* at 280 (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 272 (1978)). In order to state a claim for discrimination under Title VI, the plaintiff must allege that "(1) that they have been intentionally discriminated against on the grounds of race; and (2) that defendants are recipients of federal financial assistance." *Beaulieu v. Ashford Univ.*, 529 F. Supp. 3d 834, 850 (N.D. Ill. 2021) (quoting *Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015)), *aff'd sub nom. Beaulieu v. Ashford Univ., LLC*, No. 22-1654, 2022 WL 17076691 (7th Cir. Nov. 18, 2022). The complaint must "allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 727 (7th Cir. 2014)). "In both the discrimination and retaliation contexts, once the plaintiff has established his prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for

the adverse employment action."[4] *Scaife v. Cook County*, 446 F.3d 735, 740 (7th Cir. 2006) (citing *Firestine v. Parkview Health Sys., Inc.*, 388 F.3d 229, 233 (7th Cir. 2004), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). "If the defendant has provided a legitimate reason, the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretextual." *Id.* (citing *Firestine*, 388 F.3d at 233).

Pursuant to the ICRA, "no unit of state, county, or local government shall 'exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, or national origin'" or "utilize criteria of methods of discrimination that have the effect of subjecting individuals to discrimination because of their race, color, or national origin.*" McFadden v. Bd. of Educ. for Ill. Sch. Dist. U-46*, No. 05 C 0760, 2006 WL 6284486, at *8 (N.D. Ill. Oct. 3, 2006) (citing 740 ILL. COMP. STAT. 23/5(a)(1)). "To state a prima facie claim under the statute, plaintiff must allege that defendant 'treated the plaintiffs differently because of their inclusion in an identifiable and constitutionally protected class.'" *Id.* (citing *Raymond S. v. Sperlik*, 2005 WL 3299810, at *5 (N. D. Ill. Nov. 30, 2005)).

---

[4] "Title VI case law has traditionally borrowed jurisprudence from other civil rights laws with a similar structure and purpose." U.S. Dep't of Just., C.R. Div., Title VI Legal Manual § VI, at 6 n.8; *see also id.* (collecting cases) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("[Title VI] is parallel to Title IX . . . . The two statutes operate in the same manner . . . ."); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 346 (11th Cir. 2012) ("Title IX, like the [Rehabilitation Act] was modeled after Title VI, and the text of all three acts [is] virtually identical . . . ."); *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011) (looking to Title VII jurisprudence to analyze Title VI claims)).

The Defendants categorize the alleged discrimination into six discrete incidents:

> (1) Dollison allegedly stating to [Zariah] that "[a]ll the dark-skinned people are causing all of the problems lately;" (2) failing to conduct an investigation into Niesha's May 11, 2022 complaint about Dollison; (3) disclosing Niesha's and Zariah's identity and their complaint to Dollison; (4) finding that Dollison did not make a racist comment; (5) documenting Niesha's complaint in Skyward and failing to remove the documentation; and (6) using Niesha's complaint in suspending and expelling Zariah.

(Doc. 126, pp. 2–3 (citing Doc. 123, Ex. 1, ¶¶ 135, 154)). The Defendants paint a different story of both Niesha and Zariah's interactions with Twana Dollison. It is undisputed that Dollison met with four girls including Zariah and Ta'Myjah on March 25, 2022. (*See id.*, ¶¶ 18–26). Both Zariah and Ta'Myjah claim that Dollison made a racist comment about Black students. (*Id.*, ¶ 21–22). Zariah claims that the statement was "it's been all the dark skin people causing the problems in the school lately" (*id.*, ¶ 22 (citing *id.*, Ex. 14. 158:22–25, 164:19–23)); Ta'Myjah claims that statement was ""it's always y'all people" (*id.*, ¶ 21 (citing *id.*, Ex. 25 20:16– 22:2)); and the other two girls did not hear Dollison make any racist statements (*id.*, ¶ 23 (citing *id.*, Ex. 26 29:3–18, 30:8–13; *id.*, Ex. 27 26:9–21)).

The Defendants state that Dollison later suspended Zariah's best friend Ta'Myjah Glasper on May 11, 2022 for skipping class and violating the dress code. (*Id.*, ¶¶ 27–43). Ta'Myjah's mother Teresa Lowery "accused Dollison of being a racist and threatened to have her fired"; the Defendants insist that Niesha and Zariah were part of a coordinated effort to discredit Dollison. (*See id.*, p. 2; *see id.*, ¶¶ 27–43). They argue that Niesha first left a voicemail message for Bickel on May 11 and that Bickel

referred the matter to Dollison (1) because the issue was at the freshman Smiley campus (where Dollison was responsible for discipline) and (2) because Niesha's message did not mention any accusations of racism, only a concern about a disciplinary issue. (*Id.*, ¶¶ 39–42). When Dollison contacted her via phone, Niesha swore at her and hung up on her. (*Id.*, ¶ 43 (citing *id.*, Ex. 15 108:15–21; *id.*, Ex. 18 172:2–5)). Niesha also posted on Facebook accusing Dollison of being a racist.[5] (*Id.*, ¶ 44 (citing *id.*, Ex. 18 175:25–176:11; *id.*, Ex. 14 176:20–178:3; *id.*, Ex. 27 29:13–30:1; *id.*, Ex. 39)). Bickel and Dollison claim that they tried to resolve the situation with Niesha via an in-person meeting at OTHS, but that Niesha did not appear for their meeting. (*Id.*, ¶¶ 47–52).

Regarding Dollison's alleged statement, the Defendants argue that Zariah did not speak with Dollison on May 12, 2022 (when the statement was alleged to have taken place) and that, even if she had, that "the isolated ambiguous comment was clearly not so severe, pervasive, and objectively offensive that it barred Zariah from educational opportunities." (*Id.*, p. 5; *see also id.*, p. 4). Regarding the investigation (points (2) through (5) above), the Defendants argue that "Zariah presented no evidence that the Board, or the OTHS administration, intentionally discriminated against her on the basis of race by not investigating a complaint or by determining Dollison did not make the alleged comment." (*Id.*, p. 6). They argue that, even if Dollison made the alleged comment, "Benway's decision to proceed as she did cannot

---

[5] While Plaintiff insists that Niesha did not author this post during oral argument, the Defendants insist that Zariah's comment on the same post stating that "my mama ate" indicates that Niesha was, indeed, the author. Plaintiff did not object to this assertion. (Doc. 157).

bind the Board unless the manner in which she proceeded was pursuant to a Board *custom* to proceed that way." (*Id.*, p. 8 (citing *Burks v. City of Philadelphia*, No. CIV. A. 95-1636, 1997 WL 45031 at *7 (E.D. Penn. Jan. 31, 1997))). They argue similarly regarding Bickel informing Dollison of Niesha's complaint and the documentation of the interaction in Skyward (the electronic filing system used at OTHS). (*See id.*, pp. 8–11). Regarding use of the information contained in Zariah's file at her expulsion, the Defendants argue that "there is no mystery as to why the Board voted the way they did. This Court has the benefit of both the audiotape and transcript from the hearing in which the Board members candidly share their thoughts and suggestions for an appropriate disciplinary response for Zariah." (*Id.*, p. 12 (citing *id.*, ¶¶ 123–33)).

In opposition, Plaintiff Anthony argues that Defendants "distort testimony" from the students present at the meeting where they claim Dollison made the comment about "dark-skinned people." (Doc. 140, p. 34). She insists that Dollison's alleged remark was not isolated because she "used a racial epithet, and later recorded Zariah and Niesha's complaint about her use of the racial epithet in Zariah's 'Student Discipline Report.'" (*Id.*, p. 35). Plaintiff also argues that "[t]hereafter, she repeatedly falsely accused Niesha of making a Facebook post which detailed various racist statements and actions by Dollison, and falsely accused Zariah of skipping class with Ta Myjah" and "[t]hereafter Assistant Principal Howe threatened Zariah with "mob action" and expulsion." (*Id.* (citing SAMF, ¶ 523, 531–35)). Plaintiff argues that Dollison's comment and notes about it in Zariah's Student Discipline Report, Bickel and Benway's refusal to investigate Niesha's complaint, and Bickel's disclosure of

Niesha's identity to Dollison all evince a pervasive pattern of racial discrimination that culminated in Zariah's expulsion. (*Id.*, pp. 32–48).

Thus, the heart of Plaintiff's claim is Dollison's alleged "racial epithet," which they argue is the first link in the chain that is "the totality of the evidence" presented in this case.[6] (*See* Doc. 157). Put another way, Plaintiff's argument depends on there being a nexus between Dollison's comment, the Defendants' purported lack of investigation, Dollison's notation in Skyward, and the Board's deliberations with respect to Zariah's expulsion such that OTHS was a racially hostile environment. Notably, the race-based harassment must be so severe or pervasive so as to deprive the plaintiff of access to educational benefits. *See Bryant v. Indep. Sch. Dist. No. I–38*, 334 F.3d 928, 934 (10th Cir. 2003); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998); *see also Qualls v. Cunningham*, 183 F. App'x 564, 567 (7th Cir. 2006) (citing the same).

However, there are critical problems with Plaintiff's arguments. First,  recall that Plaintiff insists that Dollison said something to the effect of "all the dark-skinned people are causing all of the problems lately." The definition of an "epithet" is "a disparaging or abusive word or phrase." *Epithet*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/epithet  [https://perma.cc/4Z56-KE4B] (last visited Dec. 10, 2025). First, even if Dollison said this alleged sentence exactly as transcribed, it arguably does not rise to level of being a "disparaging or abusive

---

[6] This Court is cognizant of the holding in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) requiring all "direct" and "indirect" evidence to be considered together as a whole instead of in separate buckets. *See, e.g.*, *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662 (7th Cir. 2017) (citing the same).

word or phrase." *Id.* Dollison's purported remark clearly does not rise to the level of other openly vulgar and racially deprecatory language highlighted in race-based discrimination cases. *See, e.g.*, *Atkins v. The Bremerton Sch. Dist.*, No. C04-577RBL, 2005 WL 1356261 at *2 (W.D. Wash. June 7, 2005) (teacher referred to three Black students as "porch monkeys"); *Afogho ex rel. A.A. v. Illinois Cent. Sch. Dist. 104 Bd. of Educ.*, 421 F. Supp. 3d 585 (S.D. Ill. 2019) (teacher repeatedly referred to Black students as his "slaves"); *Watters v. Homeowners' Ass'n at Pres. at Bridgewater*, 48 F.4th 779, 785 (7th Cir. 2022) ("Notably, their neighbors asked the Watters why 'you people' chose to move there, called Mrs. Watters a 'black bitch' and a 'black n-----,' and called the Watters' grandchildren 'little monkey n------.'"). Moreover, even taking Plaintiff's recitation of Dollison's remark as accurate, "isolated acts of racial animus are not enough; there must be 'some nexus' between a stray remark and the challenged action." *Watters*, 48 F.4th at 786 (quoting *Scaife v. Cook County*, 446 F.3d 735, 741 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013)) (citation modified)). Thus, even assuming that Dollison's comment rises to the level of being disparaging or abusive, the single comment by itself is not sufficient to establish that OTHS was a racially hostile environment. *See Scaife*, 446 F.3d at 741. ("When a plaintiff offers an employer's stray remark in a discrimination case, it is necessary to demonstrate 'some nexus' between the remark and the challenged employment decision." (citing *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 444 (7th Cir. 1997)).

To that end, Plaintiff insists that the failure of Defendants Bickel and Benway to investigate Niesha's claim that Dollison was a racist is evidence of discrimination.

(Doc. 140, pp. 34–46). Much is made about the fact that Bickel and Benway did not treat Niesha's voicemail and phone calls as race-based grievances. (*Id.*, pp. 37–44). However, Niesha stated in her deposition that she initially left Bickel a voicemail stating that "I needed to discuss a issue of what one of his principals had stated to my daughter and her friends and that I was wanting him to give me a call back immediately." (Doc. 127, Ex. 14 106:23–107:12). She states that Bickel later returned her call (she isn't sure when) and told her that he would get back to her. (*Id.*, Ex. 14 107:4–17). Niesha then states that Dollison called her and expressed confusion because Dollison had not disciplined Zariah. (*Id.*, Ex. 14 103:3–14). Niesha says that she responded as follows: "I said, bitch why are you calling my mother-f**king phone. I didn't call -- I said I didn't – I don't want to talk to you. If I wanted to talk to you, then I would have called you. I said, so I don't know why Mr. Bickel called you and told you to call me, and I hung up in her face." (*Id.*, Ex. 14 108:16–21). She says she then spoke again with Principal Bickel, cursed at him, and accused him of telling Dollison about her "confidential" complaint. (*Id.*, Ex. 14 108:22–109:13). Niesha says that she spoke with Superintendent Benway as well; she told Benway about her complaint made to Bickel and about her interactions with Bickel and with Dollison. (*Id.*, Ex. 14 111:2–112:24). Niesha states that Benway told her that she didn't believe that Dollison would have said what she did to Zariah and the other students; Niesha insisted that she believed her daughter, "said a curse world to her," hung up on her, and never contacted her again. (*Id.*). Both Plaintiff and Defendants agree that Niesha did not speak with Dollison, Bickel, or Benway again after these phone calls.

Plaintiff also insists that there have been various complaints against Dollison and insists that the failure to investigate rises to the level of deliberate indifference to Dollison's purported racism. (Doc. 140, p. 39 (citing SAMF ¶¶ 120, 126–27, 129, 31, 136, 142–44, 147, 167–68, 170–74, 211, 217, 219–24, 230, 232–36, 239–40, 243–44, 248, 250, 252–53, 257, 259–61)). Plaintiff asserts that "[t]These events, taken together, qualify as 'objectively offensive' so as to create a hostile educational environment that effectively bars Plaintiff's access to an educational opportunity or benefit." (Doc. 140, p. 38 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)) (citing *C.S. v. Couch*, 843 F. Supp. 2d 894, 908 (N.D. Ind. 2011)). Plaintiff insists that Zariah experienced "deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress." (*Id.*). However, although Plaintiff asserts that Zariah experienced "deprivation of access to education benefits," she does not provide any evidence about how Zariah's *education* was negatively impacted *specifically* by Dollison's alleged comment. *See, e.g.*, *Elagha v. Nw. Univ.*, No. 24 C 12066, 2025 WL 1384291, at *5 (N.D. Ill. May 13, 2025) ("Nor does Elagha adequately allege that she was deprived of educational benefits while the harassment was ongoing. 'Examples of a negative impact on access to education may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence.'" (quoting *Gabrielle M. v. Park Forest-Chi. Heights*, 315 F.3d 817, 823 (7th Cir. 2003))). Both Plaintiff and the Board both state that Zariah was a good student both before and after the meeting with Dollison. (*See* Doc. 140, p. 59; *see also* Doc. 127, Ex. 2 50:14–22). Put another way, Plaintiff cannot simultaneously claim that

Zariah was effectively barred from access to education while also claiming that her expulsion was overbroad because Zariah was such a good student and admittedly had zero disciplinary incidents prior to her explusion.

Crucially, even if we assume that Dollison's statement is "severe and pervasive harassment," "[a]n institution is not deliberately indifferent under Title VI if it responds quickly and reasonably, in light of the circumstances it actually knows about, to any incidents of 'severe, pervasive, and objectively offensive' conduct." *Elagha*, 2025 WL 1384291, at \*6 (citing *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 809 (7th Cir. 2021)). "This standard 'requires that the school's response not be clearly unreasonable, which is a higher standard than reasonableness.'" *Id.* (quoting *Moore v. Freeport Cmty. Unit Sch. Dist. No. 145*, 570 F. Supp. 3d 601, 607 (N.D. Ill. 2021)). "A school's response will 'suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an "official decision" to permit discrimination.'" *Id.* (quoting *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022)). Additionally, "[a] response need not be perfect or even successful to clear this bar. A 'negligent response,' for example, 'is not unreasonable, and therefore will not subject a school to [Title VI] liability.'" *Id.* (quoting *Moore*, 570 F. Supp. 3d at 607). Moreover, victims do not "have license to demand specific remedial actions from the school." *Id.* (quoting *Moore* at 607) (citing *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014)).

Here, this Court holds that Dollison, Bickel, and Benway's conduct was not clearly unreasonable. It is obvious to this Court what transpired here. Niesha left an amorphous voicemail for Bickel regarding discipline for her daughter. After speaking

with Niesha, Bickel attempted to deescalate what he viewed as a clear misunderstanding since Zariah had not been disciplined by Dollison. Niesha admittedly swore and yelled at Dollison, at Bickel, and at Benway when each attempted to speak with her. Dollison then made a notation about the call in Skyward. While Plaintiff insists that Bickel and Benway refused to and failed to investigate Dollison for racism in accordance with the OTHS policies, it is debatable whether Niesha's calls can be considered even an informal complaint about race-based discrimination. A protected activity under Title VII is required to be "some step in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011)). While an "informal" complaint can be considered a protected activity, *see, e.g.*, *McDonnell v. Cisneros*, 84 F.3d 256, 258 (7th Cir. 1996), it is not clear whether a reasonable school official would code Niesha's admittedly inflammatory and profanity-riddled calls with staff as sufficient to initiate an investigation, especially when Dollison did not actually discipline Zariah. All in all, Plaintiff's argument that Bickel and Benway failed to investigate the Black female vice principal for racism against her Black female daughter who was, at this point, not formally disciplined in any way, strains credulity. Thus, even if Bickel and Benway were negligent in failing to open a formal racial grievance on behalf of Niesha Anthony, their response was not clearly unreasonable.

Next, Defendants Bickel and Benway both stated in their depositions that the "Student Discipline Report" function in Skyward is used by staff for all annotations

related to a particular student including parent-teacher conferences, phone interactions, and more. (*See* Doc. 127, Ex. 16 46:2–48:3; *id.*, Ex. 17 31:3–32:18). The fact that the function is titled "Discipline" does not indicate the disposition of the information contained therein. Plaintiff has argued since the inception of the case that the fact that this annotation was made in the "Student Discipline Report" section is evidence of discrimination and retaliation. However, this Court meticulously reviewed the transcripts of both the closed and open Board sessions related to Zariah's and Ky'esha Brewer's expulsions. (*Id.*, Exs. 2, 4). The notation made by Dollison is only mentioned *once* during the entirely of Zariah's September 12 disciplinary hearing: Board Member Johnson asked "[t]the incident that you spoke of from last year, is that the one where they accused Ms. Dollison" and the Speaker responded "I really don't know when it occurred last year or as a freshman. It was something to do with Ms. Dollison, but I'm not sure exactly what happened." (*Id.*, Ex. 2 50:23–25; 51:4–7). That is the entire exchange which Plaintiff claims is clear evidence that the Board improperly considered the Skyward notation when considering Zariah's discipline.

We now reach the Board session itself. Zariah and Niesha were both present at the session and were allowed to testify and to present evidence. (*See* Doc. 127, Ex. 2). The Defendants argue that "[a]s to the Board's deliberative process, there is no mystery as to why the Board voted the way they did." (Doc. 126, p. 12). Plaintiff insists that Zariah's "fight" was actually a "near fight" because she did not make contact with Ky'esha, that more egregious fights did not result in expulsion, that the administrators misled the Board, and that Dollison's comment in Skyward (which

was included in the packet of materials for Board Members) prejudiced the Board members. (Doc. 140, pp. 46–48, 55–59).

Zariah was suspended after the incident and referred to the Board for "fighting and gross misconduct, including flagrant disregard for adult safety directives, noncompliance with adult intervention, and creating severe and disruption and disorder to the school environment." (Doc. 127, Ex. 2 6:14–24, 7:25–8:13). Niesha Anthony testified at that hearing that Zariah "did wrong because was separated and did enter that room. But at the time she was fed up. She was tired." (*Id.*, Ex. 2 16:13–15). Moreover, Niesha states that "I said I take full responsibility. I didn't deny that my -- she was wrong, and I told her that. She was wrong. That child should never had entered that classroom." (*Id.*, Ex. 2 36:3–6). Moreover, although Superintendent Benway stated that she was not comfortable with showing video footage (*id.*, Ex. 2 29:18–21), the Board *was* shown the footage from the school security cameras as well as cell phone footage taken by another student that Niesha provided (*id.*, Ex. 2 31:23–37:15). The Board extensively discussed the appropriate disciplinary sanction and all of the relevant mitigating factors, including the fact that Zariah had been bullied. (*Id.*, Ex. 2). As an example, Board Member Brown expressed that the situation felt like a "good kid in a bad situation," but stated that a situation where four girls were "running around trying to fight" was a situation that could not happen. (*Id.*, Ex. 2 86:10–87:3).

As discussed *supra*, it was noted that Zariah had zero disciplinary incidents at either the Smiley freshman campus or the sophomore campus at OTHS. (Doc. 127,

Ex. 2 50:7–13). It was noted that she was "right on track to graduate." (*Id.*, Ex. 2 50:21). When asked why Zariah chose to throw a punch, she stated:

> Anybody else would have done the same thing I did in that situation. When your adrenaline is running and you're mad, what do you expect me to do? Just stop screaming and yelling? Because I'm angry. I'm fed up with whatever their bullying, whatever they're doing. I wasn't thinking in that moment because I was angry. I don't know what you want me to do.

(*Id.*, Ex. 2 49:11–18). Later, when asked to make a statement, Zariah said the following:

> I just feel like everybody mad at me for what happened and that's not the case at all. These girl on the first day of school because I felt like I need to do what have to be done to get it to stop, which I don't think it worked because they want to fight me when I come back to school, but I don't want to attend this school anymore because everybody blaming me for it.

(*Id.*, Ex. 2 62:5–13).

While Board Member Johnson expressed concern with a whole year of expulsion (*id.*, Ex. 2 89:3–6) and voted against expulsion, at the conclusion of Ky'esha's disciplinary hearing on September 19 (one week after Zariah's hearing), Johnson stated that "I just want to say to the board members and administration, after I went home, looked at the tape, thought about it, I think the board made the right decision. So I just want to put that on the record." (*Id.*, Ex. 4 63:23–64:3).

Considering the above, it is clear that Zariah's expulsion does not turn on whether the incident in question was as a "fight" versus a "near fight," but rather on the admitted and undisputed fact that Zariah went into the classroom *after* Ky'esha was contained and continued to try to hit her, refusing to stand down or to follow the commands of school administrators trying to contain the situation. To summarize,

Superintendent Benway, Principal Bickel, OTHS administrators, and the Board discussed the circumstances of the situation in detail prior to rendering a disciplinary sanction. Niesha and Zariah were both present, provided video evidence, and made statements admitting and taking responsibility for Zariah's actions. Finally, Dollison's note in Skyward was only mentioned once in passing.

Therefore, this Court holds that a reasonable factfinder could not conclude that officials at OTHS discriminated against Zariah in violation of Title VI and the ICRA. Plaintiff's attempt to link Dollison's statement, Benway and Bickel's actions, and Dollison's Skyward entry with Zariah's expulsion fails. Thus, Counts 1 and 3 of Plaintiff's Third Amended Complaint cannot survive the Defendants' Motion for Summary Judgment and must be dismissed.

## II.    Race-Based Retaliation (Title VI & ICRA, Counts 2 & 4)

"To succeed on a claim for retaliation under Title VI, a plaintiff must establish that (1) she engaged in protected activity, (2) her educational institution took an adverse action against her, and (3) a causal connection existed between the protected activity and the adverse action." *Brown v. William Rainey Harper Coll.*, No. 16 C 1071, 2017 WL 3278822, at \*5 (N.D. Ill. Aug. 1, 2017) (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)); *Weiler v. Village of Oak Lawn*, 86 F. Supp. 3d 874, 889–90 (N.D. Ill. 2015); *Su v. E. Ill. Univ.*, 565 Fed. Appx. 520, 521–22 (7th Cir. 2014)). Additionally, "[f]iling an official complaint constitutes protected activity, for which employees of federally-funded programs may not retaliate, as long as the underlying complaint asserts that the plaintiff is suffering discrimination because of

the plaintiff's protected class." *Id.* (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)).

The ICRA encompasses retaliation claims as well as discrimination claims "even absent an explicit textual reference to 'retaliation'—because retaliation *is* a form of discrimination and enforcement of anti-discrimination statutes would be undermined if it were not interpreted that way." *Cary v. Ne. Illinois Reg'l Commuter R.R. Corp.*, No. 19 C 03014, 2020 WL 1330654 (N.D. Ill. Mar. 22, 2020) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452-53 (2008); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176-77 (2013); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969), abrogated by *Ziglar v. Abbasi*, 582 U.S. 120 (2017)).

Zariah alleges that the OTHS Board took the following actions in retaliation against her because of Dollison's alleged statement:

> (1) [R]efusing to conduct an investigation into Niesha's May 11, 2022 complaint about Dollison; (2) disclosing Niesha's and Zariah's identity and their complaint to Dollison; (3) directing Dollison to call Niesha; (4) finding that Dollison did not make a racist comment; (5) documenting Niesha's complaint in Skyward, failing to notify Zariah and Niesha of this documentation, and failing to remove the documentation; (6) using Niesha's complaint in suspending and expelling Zariah; (7) suspending Zariah for 10 days; (8) expelling Zariah for the remainder of the 2022-2023 school year; (9) seeking to otherwise intimidate Zariah; and (10) permitting, causing, or contributing to numerous other acts of discriminatory and retaliatory conduct against Zariah, Niesha, and others to intimidate them for their opposition to racially discriminatory acts [by] the Board.

(Doc. 126, pp. 13–14 (citing Doc. 123, Ex. 1, ¶¶ 147, 165)). First, the Defendants argue that Zariah herself did not engage in any protected activity and lacks standing to sue entirely because the "basis for her retaliation claim is not her own conduct, but the conduct of her parent." (*Id.*, p. 14). They claim that the requirements for third-party

standing are not met here. (*See id.*, p. 15 (citing *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000))). The Defendants insist that the only adverse action taken against Zariah was to discipline her for her conduct in the September 6, 2022 altercation and that "there is no causal connection between Dollison's Skyward entry from May 12, 2022 and Zariah's suspension and expulsion." (*Id.*, p. 16). They point to the records of the Board's disciplinary hearing and the fact that "Ky'Esha received the same discipline as Zariah and there is no evidence that Ky'Esha or her family ever complained to administrators of racism." (*Id.*, p. 17 (citing *id.*, ¶¶ 115, 134–35)).

In opposition, Plaintiff insists that Niesha reported Dollison's purported racist statement on behalf of Zariah, meaning that her complaint to the administration was ipso facto made by her daughter. She cites only an out-of-circuit district court case, *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293 (S.D. Tex. 1996), for this proposition. (*See* Doc. 140, pp. 49–50 (citing the same)). She also cites this Court's own holding that she had stated a claim in response to Defendants' Rule 12(b)(6) Motion to Dismiss. (Doc. 140, p. 50 (citing A*nthony v. O'Fallon Township High Sch. Dist. 203 Bd. Of Educ.*, 712 F.Supp.3d 1109, 1120 (S.D. Ill. 2024)). Plaintiff insists that "[i]t would not be unreasonable for a jury to conclude that, given the circumstances, Zariah depended on her mother to make the report to the appropriate school officials." (Doc. 140, pp. 51–52). Plaintiff also insists that Dollison intentionally falsely identified Zariah in a video of students skipping class (*id.*, p. 54) and insist that the Defendants misapplied their own policies in Zariah's expulsion (*id.*, pp. 55–60).

As this Court discussed the factual background of this case in detail in Section I, we will not reproduce that discussion here. First, although Defendants argue that Niesha's speech cannot be used as the basis for retaliation against Zariah (*see* Doc. 126, p. 15 (citing *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000))), this Court finds that holding as such would create perverse outcomes. As Defendants note, the Seventh Circuit stated in *Massey* that "[t]he Supreme Court has established a narrow exception to this doctrine, allowing third-party claims when the third-party plaintiff can show a close relationship between the first and third party and some obstacle to the first party's ability to protect his own interest." 221 F.3d at 1035 (*citing Powers v. Ohio*, 499 U.S. 400, 411, 111 S. Ct. 1364, (1991); *Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996)). Clearly, a minor child like Zariah cannot be required to make a race-based discrimination complaint on her own behalf. As discussed at oral argument, it would be preposterous to require a second grader to make a complaint of discrimination on his or her own behalf; clearly, parents must be able to advocate on behalf of minor children in the face of purported discrimination. (*See* Doc. 157). Thus, it is clear that, regardless of the dearth of caselaw addressing this precise factual situation, it is possible and plausible for a child to be subject to retaliation based on the parent's activity. Therefore, this Court holds that Plaintiff has standing to use her complaint to the OTHS administration as the protected activity here. Additionally, Zariah's expulsion was, clearly, an adverse action in line with the third element of a Title VI retaliation claim. *See Brown v. William Rainey Harper Coll.*, No. 16 C 1071, 2017 WL 3278822, at *5 (N.D. Ill. Aug. 1, 2017) (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)); *Weiler v. Village of Oak Lawn*, 86 F. Supp. 3d 874,

889–90 (N.D. Ill. 2015); *Su v. E. Ill. Univ.*, 565 Fed. Appx. 520, 521–22 (7th Cir. 2014)).

However, Plaintiff's argument falls apart at the requirement of a causal connection between the protected speech and the adverse action. The Seventh Circuit has stated that "that the court is not a 'super personnel department that second-guesses employers' business judgments.'" *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 915 (7th Cir. 2025) (quoting *Riley v. Elkhart Community Schs.*, 829 F.3d 886, 895 (7th Cir. 2016)). "To say that an employer's justification is a pretext means to say that it is 'a lie, specifically a phony reason for some action.'" *Id.* at 914 (citing *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023)). Moreover, "evidence of pretext does not require but does permit an inference of unlawful motive, meaning that summary judgment should be denied and the ultimate question of motive given to the trier of fact to decide." *Id.* at 915 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Vichio v. U.S. Foods, Inc.*, 88 F.4th 687, 694–95 (7th Cir. 2023); *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996)). Additionally, "an employer's shifting and inconsistent explanations for an adverse employment action can support an inference of pretext." *Id.* (citing *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003)).[7]

As discussed in Section I, Plaintiff has not met her burden to prove the Zariah's expulsion was causally connected to Niesha's phone calls to Dollison, Bickel, and

---

[7] *See supra* note 4.

Benway alleging that Dollison was a racist or that the Board's decision to expel Zariah was pretextual. As noted *supra*, the Board explained their reasoning for Zariah's expulsion in great detail; the Board Members' concerns and justification for Zariah's expulsion are clear. While Plaintiff insists that Zariah was expelled because of Niesha's complaints, it is obvious from the record that Zariah was expelled because of Zariah's own actions in the incident with Ky'esha Brewer. Plaintiff's attempts to connect Dollison's comment in Skyward with Zariah's expulsion fail to rebut the Defendants' Motion for Summary Judgment. Nowhere were the Board's justifications "shifting or inconsistent." Rather, the Defendants have advanced the same reasoning for Zariah's expulsion since day one: she was expelled for gross disobedience stemming from the incident with Ky'esha.

As the Seventh Circuit has noted, "[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995). Zariah has not presented any admissible evidence that Dollison, the Board, or any of the Defendant administrators retaliated against her in any way. As noted *supra*, the fight at issue was *filmed on video*, both Zariah and Ky'esha and their parents were given the opportunity to testify and present evidence to the School Board at separate hearings, and both were expelled as a result of it. Moreover, Zariah's own statements did not express remorse and indicated that she believed there would be more fighting if she returned to school. (Doc. 127, Ex. 2 49:11–18, 62:5–13).

Therefore, considering all of the above and taking the facts in the light most favorable to Plaintiff, this Court holds that a reasonable factfinder could not find in

her favor. Thus, she has failed to rebut Defendants' Motion for Summary Judgment and Counts 2 and 4 of her Third Amended Complaint must be dismissed, as well.

### III.   Equal Protection (Fourteenth Amendment, Counts 5 & 7)

To levy a claim under 42 U.S.C. § 1983, "a plaintiff must allege that he or she was (1) deprived of a federal right, privilege, or immunity (2) by any person acting under color of state law." *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 638 (1980)). "To state a claim under § 1983 for local governmental liability under *Monell*, a plaintiff must allege that her harm resulted from a constitutional violation and that the local governmental body is responsible for the violation." *Moore*, 570 F. Supp. 3d at 612 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (referring to *Monell*). "Local governmental liability under § 1983 is limited to violations caused by (1) an express policy, (2) a widespread practice so well-settled it becomes a custom, or (3) a person with final policymaking authority for the local governmental body." *Id.* (citing *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). There must be a constitutional violation in order for a school board to be liable under *Monell. Id.* (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010)). Additionally, to establish liability in a § 1983 equal protection claim, the plaintiff "must show that [the defendant] acted with a nefarious discriminatory purpose and discriminated against her based on her membership in a definable class." *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (citing *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996)).

The Defendants argue that "[w]hile Zariah may not agree with the Benway's findings and decision, that does not raise a constitutional issue, especially when Zariah failed to exercise her right to file a formal grievance and elevate the matter under Board Policy 2:260." (Doc. 126, p. 23). They insist that Dollison's alleged May 12, 2022 statement is not actionable, and that Dollison, Bickel, and Benway's actions taken regarding Niesha's complaints did not violate Zariah's equal protection rights. (*See id.*, pp. 23–26).

Plaintiff insists that there was widespread knowledge among the school administration and student body that Dollison was a racist and discriminated against black students, including the organization of a protest against her. (Doc. 140, pp. 60–66). She insists that this converts Dollison's allegedly isolated racial epithet into a pattern of harassment sufficient to make her equal protection claim actionable. (*Id.*, pp. 66–69). The Defendants insist in their Reply that Plaintiff has not provided a suitable comparator, meaning that her equal protection claim cannot survive. (Doc. 150, p. 5).

First, Plaintiff's Third Amended Complaint apparently attempts to bring both discrimination and retaliation claims pursuant to the Equal Protection Clause.[8] (*See* Doc. 154, ¶¶ 170, 198). However, recall that "the right to be free from retaliation may

---

[8] This is curious because this matter was already addressed in this Court's January 23, 2024 Order on the Defendants' Motion to Dismiss. (*See* Doc. 38, p. 25 ("The equal protection discrimination claim in Count 7 thus survives the Motion to Dismiss. Moreover, although Anthony lists the Counts 8–10 as being for "retaliation" under the Equal Protection Clause and the First Amendment, as stated *supra*, the Equal Protection Clause does not create a right to be free from retaliation except as a form of discrimination (i.e., the Equal Protection Clause does not create a separate cause of action for retaliation). As she is able to bring these claims as part of an equal protection discrimination claim and as a First Amendment claim, the Court reads these claims as such. With this in mind, Counts 7, 8, 9, and 10 survive the OTHS Defendants' Motion to Dismiss.").

be vindicated under the First Amendment or Title VII,[9] but not the equal protection clause." *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004) (citing *Grossbaum v. Indianapolis–Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989); *Vukadinovich v. Bartels*, 853 F.2d 1387, 1391–92 (7th Cir. 1988); *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997); *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996); *Ratliff v. DeKalb County*, 62 F.3d 338, 340–41 (11th Cir. 1995*); Thompson v. City of Starkville*, 901 F.2d 456, 468 (5th Cir. 1990)). Thus, as a matter of law, Zariah cannot bring a retaliation claim under the Equal Protection Clause. This leaves her with a discrimination claim against Dollison and the Board.

Moving forward, "a § 1983 plaintiff can demonstrate that the defendant treated him differently 'either by statistical analysis or by identifying a particular similarly situated member of the unprotected class who was treated differently from him.'" *Gaines v. Dart*, 158 F.4th 829, 835 (7th Cir. 2025) (quoting *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017)). Critically, Plaintiff has provided neither statistical evidence nor evidence from suitable comparators to show that she was treated differently because of her race. Like in *Gaines*, Plaintiff insists that Dollison discriminated against other Black students but provides no admissible evidence that Dollison treated non-Black students differently. She does not mention a suitable comparator in her Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 140). She mentions that Dollison herself recalled that Ta'Myjah

---

[9] *See supra* note 4.

Glasper accused her of being harder on Black girls' wardrobe choices than white girls' clothing. (Doc. 141, ¶ 31). However, Ta'Myjah testified in her deposition that she never witnessed white girls being treated differently by Dollison. (Doc. 127, Ex. 25 84:4–18). Plaintiff also mentions another unnamed teacher stating that a Black student felt that Dollison's conduct showed a discrepancy between allowed attire for Black young women and white young women. (*Id.*, ¶ 56). Critically, all of these statements are hearsay, which is inadmissible at summary judgment as at trial.[10] *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 907 (7th Cir. 2025) ("Evidence supporting and opposing a motion for summary judgment must be admissible in the same manner as at trial, except that parties may rely on sworn declarations in lieu of live testimony.") (citing *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017); FED. R. CIV. P. 56(c)(2); *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014)). Additionally, Plaintiff mentions a 2022 school-wide "Wear Red Day" protest against Dollison, but does not state that Zariah participated in this protest. (Doc. 140, p. 64).

Similarly to *Gaines*, Plaintiff encounters critical issues with the element of causation. 158 F.4th at 835–38. Even if Plaintiff had provided sufficient evidence to show that Bickel and Benway harbored racial animus toward her, it was the Board, not either of them, who made the final decision regarding Zariah's expulsion. Although Plaintiff insists that Assistant Principal Howe (who is not named as a

---

[10] As an aside, this Court notes that these two statements were located in Plaintiff's voluminous Statement of Additional Material Facts (Doc. 141) and evinces the character of that document in microcosm (i.e., various non-material and inadmissible statements).

Defendant here), Bickel, and Benway influenced the Board's decision, this argument is belied by the transcript of the Board hearing. (Doc. 127, Ex. 2). Plaintiff has not provided any evidence that Howe, Bickel, or Benway harbored racial animus toward her and that their animus was impermissibly injected into the Board proceedings via the "cat's paw" theory of liability.[11] *See Gaines* at 835–38.

Recall that "summary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). Moreover, in order to "preclude summary judgment, the non-moving party must show the disputed fact to be material, that is, it must be outcome-determinative under the applicable law. Thus, facts not outcome-determinative . . . , though in dispute, may still permit the entry of summary judgment." *Smith ex rel. Smith v. Severn*, 129 F.3d 419 (7th Cir. 1997) (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav.*, 806 F.2d 146, 149 (7th Cir. 1986)). Plaintiff has not provided material, admissible facts to rebut the Defendants' Motion for Summary Judgment with respect to Counts 5 and 7. Thus, in absence of evidence of a suitable comparator, Plaintiff's equal protection claims are dead in the water and must be dismissed.

---

[11] The "cat's paw" theory of liability is discussed in greater detail in Section IV *infra.*

## IV.    Retaliation (First Amendment, Counts 6, 8, 9 & 10)

First Amendment retaliation claims consist of three elements. "First, [the plaintiff] must show he engaged in protected First Amendment activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).

The Defendants argue again that *Zariah* did not engage in any protected activity sufficient to grant her standing to bring a First Amendment retaliation claim. (Doc. 126, p. 28; *see also id.*, Section II). They argue that Zariah has not provided any evidence to show that Dollison, Bickel, Benway, or the Board retaliated against her in violation of the First Amendment. (*Id.*, pp. 30–33). Plaintiff insists in opposition that Niesha's informal complaint to Principal Bickel and to Superintendent Benway provides the requisite protected activity. (Doc. 140, pp. 69–80).

In *Springer v. Durflinger*, 518 F.3d 479 (7th Cir. 2008), the Seventh Circuit upheld the district court's grant of summary judgment on a First Amendment retaliation claim. The Seventh Circuit noted that:

> There is a dispute here in the generic sense—the parties adamantly dispute the explanations for the various events that occurred after the January 30 meeting. The parents argue that the events were fueled by the school's retaliatory motives. The school officials, on the other hand, say they made policy decisions based on factors wholly distinct from the Springers' and Collinses' complaints. This disagreement centers on the parents' speculation about the school's retaliatory motives.

*Id.* at 484. The *Springer* Court stated that "[t]he parents' argument in opposition to summary judgment boils down to an allegation that defense witnesses are lying and

the stated reasons for the school's actions are phony. They argue that there are 'two sides to every story, which makes this a perfect credibility case for a jury to decide.'" While it is inappropriate for the district court to make credibility determinations at summary judgment, "when challenges to witness' credibility are all that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper." *Id.* (citing *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998)). In *Springer*, "all the plaintiffs [had] to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment." *Id.* (citing *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994).

Plaintiff insists that "[i]n the summary judgment context . . . to rebut the defendants' proffered explanations for their terminations, plaintiffs must produce evidence upon which a rational finder of fact could infer that these explanations were lies." (Doc. 140, p. 73 (citing *Vukadinovich v. Bd. Sch. Trs. N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002)).[12] Plaintiff also cites to *Taylor v. Ways* to argue that Benway and Bickel, even though they were not the final decisionmakers with respect to Zariah's expulsion, can still be held liable under the so-called "cat's paw" theory of liability. (Doc. 140, p. 82 (citing 999 F.3d 478, 488 (7th Cir. 2021))). To succeed using this theory, the plaintiff must prove that subordinate government employees acted with unlawful motives in order to cause the actual decisionmakers to take adverse action. *See Taylor*, 999 F.3d at 488. To that end, Plaintiff argues that Benway and

---

[12] Notably, the plaintiff in *Vukadinovich* failed to prove that the defendants' justifications were pretextual. *See* 278 F.3d at 699.

Bickel intentionally manipulated the Board to expel Zariah because of racial animus against her. (*Id.*).

Both of these theories of liability are belied by the extensive factual record in their case. Based on the transcripts of the Board disciplinary hearing and on the deposition testimony of both Niesha and Zariah Anthony, of the OTHS administrators, and of the Board Members, it is clear that Plaintiff cannot offer evidence that Zariah's expulsion was pretextual or that Bickel and Benway "cooked the books" to ensure that Zariah was expelled in accordance with the "cat's paw" theory of liability. As discussed at length *supra*, the reasons for Zariah's expulsion were provided in detail, regardless of whether Plaintiff agrees with those reasons. As in *Vukadinovich*, Plaintiff's arguments rely upon speculation as to the motives of the school administrators and are not supported by admissible evidence. *See* 278 F.3d at 699.

Additionally, in the First Amendment retaliation context, the Seventh Circuit applies "an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). Critically, it does not matter whether or not the Plaintiff continued to file grievances as "a contrary rule would stymie every First Amendment retaliation suit: Only plaintiffs who refuse to be silenced make their way to federal court." *Id.* at 647 (citing *Van De Yacht v. City of Wausau*, 661 F. Supp. 2d 1026, 1034 (W.D. Wis. 2009)). "Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, we can

resolve the issue as a matter of law." *Id.* (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). Both Niesha and Zariah had the opportunity to testify and present evidence (including videos of the incident in question) at Zariah's disciplinary hearing. (Doc. 127, Ex. 2). As noted *supra*, Plaintiff has failed to link the incident with Dollison and its aftermath at the Smiley campus with her expulsion the next school year.

Therefore, considering the above, Plaintiff cannot defeat the Defendants' Motion on her First Amendment claims. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). This Court holds that a reasonable factfinder could not find in Plaintiff's favor, meaning that the Defendants' Motion for Summary Judgment must be granted on Counts 6, 8, 9, and 10.

## V.     Injunctive Relief (Count 11)

Plaintiff also seeks a permanent injunction "to expunge Zariah's record, including removal of the complaint on her 'Student Discipline Report,' her unwarranted and unjustified expulsion, and any other disciplinary mark related to or arising out of the events described in the Third Amended Complaint." (Doc. 140, pp. 82–83).

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023) (quoting *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021)). The purpose of a preliminary injunction is "preserve the relative positions of the

parties until a trial on the merits can be held." *Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). The issuance of a preliminary injunction should also "minimize the hardship to the parties pending final judgment." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988).

Crucially, "[t]he party seeking a preliminary injunction bears the burden of showing that it is warranted." *Finch*, 82 F.4th at 578 (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). In the Seventh Circuit, "a district court engages in an analysis that proceeds in two distinct phases to decide whether such relief is warranted: a threshold phase and a balancing phase." *Valencia v. City of Springfield,* 883 F.3d 959, 965 (7th Cir. 2018). In order to proceed beyond the "threshold phase," the party seeking a preliminary injunction must satisfy three requirements via a showing that: "(1) it will suffer irreparable harm in the period before the resolution of its claim; (2) traditional legal remedies are inadequate; and (3) there is some likelihood of success on the merits of the claim." *HH Indianapolis, LLC v. Consol. City of Indianapolis & Cnty of Marion*, 889 F.3d 432, 437 (7th Cir. 2018); *see also Finch* at 578 (citing *Speech First*, 968 F.3d at 637); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

Additionally, "[i]f it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms." *Valencia*, 883 F.3d at 966 (quoting *Green River Bottling Co. v. Green River*

*Corp.*, 997 F.2d 359, 361 (7th Cir. 1993)). "The two most important considerations are likelihood of success on the merits and irreparable harm." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Moreover, regarding the likelihood of success on the merits, "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *Id.* (quoting and disapproving *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)); *see also Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) ("[A]n applicant for preliminary relief bears a significant burden, even though the Court recognizes that, at such a preliminary stage, the applicant need not show that it definitely will win the case. A 'strong' showing thus does not mean proof by a preponderance—once again, that would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending. But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case.").

If the threshold requirements are met, "the court must balance the equities, weighing the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party and the public—including third parties—if it is granted." *Finch* at 578 (citing *Cassell*, 990 F.3d at 545). In the second phase, "the court weighs the harm of denying an injunction to the movant against the harm of granting an injunction to the nonmovant." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023). This is accomplished via "a sliding scale—the greater the movant's likelihood of success on the merits, the less the harms need be in its favor." *Id.* (citing *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). The court must also consider the public interest. *Id.*

Permanent injunctions are "not available as a matter of course." *Liebhart v. SPX Corp.*, 998 F.3d 772, 774 (7th Cir. 2021). Rather, as a "creature of equity, . . . the district court has discretion to decide whether that relief is warranted, even if it has found liability." *Id.* Relief via a permanent injunction is appropriate if the applicant proves the following: "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate . . . ; (3) that, considering the balance of hardships . . . , a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 779 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "The ultimate decision whether to issue such an injunction lies within the discretion of the district court." *Id.* (citing *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013)). The Seventh Circuit has made it clear that "an injunction issues 'only as necessary to protect against otherwise irremediable harm'" and that they "give great deference to the court's decision either to issue or to deny an injunction." *Id.* (quoting *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933. 944 (7th Cir. 2019)) (citing *United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867 (7th Cir. 1994); *Bowes v. Ind. Sec'y of State*, 837 F.3d 813, 817 (7th Cir. 2016)).

"A permanent injunction (as opposed to a preliminary injunction or a temporary restraining order) is not provisional in nature, but rather is a final judgment." *Plummer v. Am. Inst. of Certified Pub. Accts.*, 97 F.3d 220, 229 (7th Cir. 1996) (citing *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir. 1992)). Thus, while the applicant for a preliminary injunction "must establish that he is likely to succeed on the merits," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), "when the plaintiff is seeking a permanent injunction, the first of the four

Page 40 of 49

traditional factors is slightly modified, for the issue is not whether the plaintiff has demonstrated a reasonable likelihood of success on the merits, but whether he has in fact succeeded on the merits." *Plummer*, 97 F.3d at 229 (citing *Amoco v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)).

The Defendants argue that, although Zariah claimed that she would suffer "significant damages to her future education and ability to seek admission to college," that she has not supplemented her answer since May 22, 2024 and has not provided any information describing this harm in detail. (Doc. 126, p. 37 (citing *id.*, ¶ 142)). They argue that this shows that her injunctive relief claim is moot and that summary judgment should be granted in their favor. In opposition, Plaintiff argues that she meets all four prongs, as she has demonstrated success on the merits, there is no adequate remedy at law to expunge the records in question, that an equitable remedy is warranted, and that the Defendants will not suffer farm. (Doc. 140, pp. 82–85).

As is the Seventh Circuit's preference, the Court will consider the likelihood of success on the merits before considering whether or not the Plaintiff has alleged irreparable harm. Considering the extensive discussion *supra,* it is clear that Plaintiff has not succeeded on the merits of *any* of her claims, which precludes the application of a permanent injunction. *Plummer v. Am. Inst. of Certified Pub. Accts.*, 97 F.3d 220, 229–30 (7th Cir. 1996) (quoting *Ced's Inc. v. E.P.A.*, 745 F.2d 1092, 1100 (7th Cir. 1984); 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2941 (1995)). As she has not met this critical prong, this Court need not consider the other required factors. *Valencia v. City of Springfield,* 883 F.3d 959, 965 (7th Cir. 2018) (quoting *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th

Cir. 1993)). Accordingly, the Defendants' Motion for Summary judgment shall be granted with respect to Count 11, as well.

## VI.   Writ of Certiorari (Count 12)

Plaintiff also petitions for a writ of certiorari to enable this Court to review the Board's decision to expel Zariah for the 2022–23 school year. (See Doc. 154, ¶ 282). The Defendants argue here that "Zariah's writ of certiorari claim fails because it was filed years outside of the six-month statute of limitations." (Doc. 126, p. 39; *see id.*, p. 38 (citing *Alicea v. Snyder*, 321 Ill. App. 3d 248, 252 (Ill. App. Ct. 2001))). They argue that, even if timely filed, that Zariah's claim is meritless because "the evidence clearly shows that Zariah violated the Board's policy by instigating a fight, throwing a punch at a student who was restrained, punching a teacher, chasing a student into an occupied classroom, yelling and screaming, and ignoring directives from OTHS administrators and staff," which shows that her expulsion was within the Board's discretion. (*Id.*, p. 39). They also note that Zariah seeks damages in connection with her writ of certiorari that are not available for such a claim. (*Id.*, p. 40 (citing *Stratten v. Wenover Cmty. Unit Dist. No. 1*, 551 N.E.2d 640, 645–46 (Ill. 1990); *Wilborn v. Jeffreys*, 2023 IL App (4th) 210216-U, ¶ 1)). They argue that both the "American Rule" and the Illinois Local Government and Government Employees Tort Immunity Act, 745 ILL. COMP. STAT. 10/1-11, *et seq.*, show that the ad damnum clause in Count 12 should be stricken. (*Id.*, pp. 40–41).

In opposition, Plaintiff argues that her claim for a writ of certiorari relates back to the filing of the original Complaint filed on February 23, 2023 (Doc. 1), less than six months after Zariah's expulsion on September 12, 2022 (Doc. 127, Ex. 2).

(Doc. 140, pp. 85–86 (citing FED. R. CIV. P. 15(c)(1)(B)). Plaintiff argues that this writ is appropriate because the written Expulsion Decision violated Illinois School Code in that the history of Zariah's past conduct was not included as required by the Code. (Doc. 140, pp. 86–87); *see* 105 ILL. COMP. STAT. 5/10-22.6(b-20). Plaintiff insists that "at no time during the Board's disciplinary hearing did the Board consider whether Zariah's continuing presence in school would either (a) post a threat to the safety of other students, staff, or members of the school community or (b) substantially disrupt, impede, or interfere with the operation of the school, as required by Illinois statute." (Doc. 140, p. 87).

However, in reviewing the transcript of the Board hearing, this Court notes that Zariah's lack of prior disciplinary history and the potential impact of her continued presence at OTHS *were* discussed at length. (*See, e.g.*, Doc. 127, Ex. 2 50:7–13, 50:21, 86:10–87:3). Moreover, Zariah herself stated that "I don't think it worked because they want to fight me when I come back to school, but I don't want to attend this school anymore because everybody blaming me for it." (*Id.*, Ex. 2 62:5–13). Thus, she directly testified *during the hearing* that fighting would likely continue if she returned to school. Moreover, as noted *supra*, Zariah's expulsion was not solely based on the physical altercation itself, but rather was for "fighting and gross misconduct, including flagrant disregard for adult safety directives, noncompliance with adult intervention, and creating severe and disruption and disorder to the school environment." (Doc. 127, Ex. 2 6:14–24, 7:25–8:13). While Plaintiff insists that "no forms of non-exclusionary discipline were considered and school officials were never provided "testimony of any other interventions attempted and exhausted or of their

Page 43 of 49

determination that no other appropriate and available interventions were available for the student," (Doc. 140, p. 28 (citation modified) (citing SAMF ¶¶ 863–67)), it is clear from the record that the Board discussed disciplinary options at length.

Therefore, this Court holds that the Board acted in accordance with the Illinois School Code and with OTHS policy when expelling Zariah for the remainder of the 2022–23 school year. For this reason, summary judgment must be granted on Count 12. As this claim fails, this Court does not reach the question of whether or not Plaintiff is entitled to damages as well as injunctive relief. (*See* Doc. 126, pp. 38–41; Doc. 140, pp. 88–89).

## VII.    Qualified Immunity with Respect to Counts 7, 8, 9 & 10

"Qualified immunity shields federal and state officials from monetary liability unless the law they ostensibly violated was clearly established at the time of the alleged offense." *Taylor v. Schwarzhuber*, 132 F.4th 480, 486 (7th Cir. 2025) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "Qualified immunity is an affirmative defense, but once it is raised the burden shifts to the plaintiff to defeat it." *Holleman v. Zatecky*, 951 F.3d 873, 877 (7th Cir. 2020) (citing *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001)). When qualified immunity is raised by a defendant "at the summary judgment stage, a plaintiff may overcome that assertion by showing (1) there is a dispute of material fact as to whether the official violated a 'statutory or constitutional right,' and (2) the right was 'clearly established at the time' of the challenged conduct." *Taylor*, 132 F.4th at 486 (quoting *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021) (internal quotations omitted)). "A clearly established law is one where 'existing precedent [has] placed the statutory or constitutional question beyond

debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). "Courts consider whether '[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Notably, "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Henry v. Hulett*, 969 F.3d 769, 785 (7th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "The right must be established not as a general proposition but in a particularized manner so its contours are clear to a reasonable official." *Id.* (citing *Reichle v. Howards*, 566 U.S. 658, 665 (2012)).

The individual Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's Equal Protection claim against Dollison (Count 7) and her First Amendment retaliation claims against Dollison, Bickel, and Benway (Counts 8, 9, 10). (Doc. 126, p. 34). They argue that "[l]ooking at the actions taken by each of the individual defendants separately and based on the information available to them at the time and not without the benefit of hindsight, it simply cannot be stated that they violated Zariah's constitutional rights" and that "Further, . . . the rights at issue were not clearly established at the time of the alleged misconduct." (*Id.*, p. 35). The Defendants insist that "Section 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." (*Id.* (citing *Tun v. Whitticker*, 398 F.3d 899, 903 (7th Cir. 2005))).

In opposition, Plaintiff argues that "at the time the events took place, it was clearly established that a government official violates the Equal Protection Clause and the First Amendment when they discriminate and retaliate against a student on the basis of race or retaliate against a student for their protected speech" and that "Section 1983 claims for discrimination and retaliation are well-established and have been litigated for *decades* at the federal district, circuit, and Supreme Court levels." (Doc. 140, p. 80 (citing *Anthony v. O'Fallon Township High Sch. Dist. 203 Bd. Of Ed.*, 712 F.Supp.3d 1109, 1127 (S.D. Ill. 2024); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1091 (7th Cir. 2008)). She insists that because there is sufficient evidence to support her claims that Zariah's constitutional rights were violated, that the Defendants cannot employ qualified immunity to shield their actions. (*Id.*, pp. 81–82).

Recall that "[l]ocal governmental liability under § 1983 is limited to violations caused by (1) an express policy, (2) a widespread practice so well-settled it becomes a custom, or (3) a person with final policymaking authority for the local governmental body." *Id.* (citing *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). There must be a constitutional violation in order for a school board to be liable under *Monell. Id.* (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010)). Additionally, to establish liability in a § 1983 equal protection claim, the plaintiff "must show that [the defendant] acted with a nefarious discriminatory purpose and discriminated against her based on her membership in a definable class." *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (citing *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996)).

Additionally, in order "[t]o prevail on a First Amendment retaliation claim, a plaintiff must establish three elements": (1) "he must show he engaged in protected First Amendment activity," (2) "he must show an adverse action was taken against him," and (3) "he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).

Clearly, Plaintiff has not established that the individual Defendants have violated her rights under the Equal Protection Clause or the First Amendment. She has failed to provide evidence to rebut Defendants' Motion for Summary Judgment with respect to the equal protection discrimination claim against Dollison and the First Amendment retaliation claims against Dollison, Bickel, and Benway. If she had, however, this Court holds that Dollison would be entitled to qualified immunity as to the Equal Protection Clause claim against her and that Dollison, Bickel, and Benway would be entitled to qualified immunity with respect to Plaintiff's First Amendment retaliation claim against them. Clearly, the rights to be free from unequal treatment based on race and from retaliation based on one's protected speech (including formal and informal complaint) has been clearly established. That being said, this Court discussed *supra* that reasonable administrators would not take Niesha's profanity-laden tirades against them as evincing an interest in filing a race-based discrimination complaint. Additionally, Bickel and Benway's testimony at Zariah's disciplinary hearing does not demonstrate an unconstitutional violation of Zariah's (and Niesha's) First Amendment rights. Therefore, this Court holds that even if Plaintiff had provided sufficient evidence to rebut the Defendants' Motion for

Summary Judgment on her constitutional claims, that the individual Defendants would enjoy qualified immunity with respect to Counts 7, 8, 9, and 10.

## VIII.  Sanctions

The Defendants also renew their request for sanctions as related to the matter of Niesha and Zariah Anthony's residency, arguing that they made "knowing and intentional false statements to this Court and during their depositions as to their true residency." (Doc. 126, p. 49 (citing Doc. 75)).

Federal Rule of Civil Procedure 37(a)(1) permits a party to "move for an order compelling disclosure or discovery" provided that the motion includes "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." This certification is also required by Local Rule 26.1(c)(2) and the Court's Case Management Procedures. Rule 37(b) provides that failure to comply with a discovery order issued by the court is a sanctionable offense, with potential sanctions including dismissal of the action in whole or in part, default judgment, or holding a party in contempt of court. *See* FED. R. CIV. P. 37(b)(2)(A).

Defendants' Motion for Sanctions (Doc. 75) was denied without prejudice on April 1, 2025 after the parties informed this Court that the relevant discovery disputes had been resolved. (Doc. 107). Moreover, even if the Anthonys did lie about their residency, it is undisputed that the matter of Zariah's residency does not obviate the Defendants' duty to Zariah as a student. If OTHS wished to adjudicate the matter of Zariah's residency, they should have taken the appropriate procedural steps while

Zariah was still a student. This Court holds that sanctions are not appropriate at this time and that the Defendants' request for sanctions is denied.

As an aside, this is a particularly tough case and this Court once again commends the parties for their vigor and for their thoughtful arguments.

## CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment (Doc. 123) is **GRANTED**. This matter is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED:  March 31, 2026**

s/ *Stephen P. McGlynn*
**STEPHEN P. McGLYNN**
**U.S. District Judge**